IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 12, 2008

Charles R. Fulbruge III
Clerk

No. 07-20212

UNITED STATES OF AMERICA

Plaintiff-Appellant

v.

KEVIN HOWARD

Defendant-Appellee

Appeal from the United States District Court for the
Southern District of Texas

Before HIGGINBOTHAM, DAVIS, and SMITH, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

This is an appeal by the government from a district court order vacating the convictions of and granting a new trial to Defendant-Appellee Kevin Howard ("Howard"). Howard was convicted on five counts: conspiracy to commit wire fraud ("Count 1"), three counts of wire fraud ("Counts 2–4"), and one count of falsifying books and records ("Count 5"). The prosecution's case was based in part on a theory that both the conspiracy to commit fraud and the fraud were to deprive Enron of the defendant's "honest services." Shortly after the trial but before sentencing, this Court decided United States v. Brown, 459 F.3d 509 (5th Cir. 2006), cert. denied, 127 S. Ct. 2249 (2007), which clarified the meaning of "honest services" fraud. Howard then filed a post-trial motion to vacate his

convictions based on Brown and argued that the convictions on all five counts should be vacated. The government opposed Howard's motion only with regard to Count 5, the conviction for falsifying books and records. The district court vacated all of Howard's convictions, including Count 5. We agree with the district court that the erroneous "honest services" instruction tainted Count 5, along with the other counts, and under Yates v. United States, 354 U.S. 298 (1957), we affirm.

I.

Defendant Kevin Howard was the Chief Financial Officer of Enron Broadband Services ("EBS"), a unit of Enron Corporation created to enter the telecommunications business. EBS entered into an agreement with Blockbuster, Inc., under which EBS and Blockbuster would stream movie and other video material to the computers of Blockbuster customers over an EBS network.

EBS was projected to lose some $60 million in 2000. Toward the end of the Summer, EBS considered "monetizing" the Blockbuster agreement, which would allow EBS to post immediate profits despite the fact that the agreement was not generating profits in the short term. It is alleged that to make the monetization meet accounting rules, and thus be approved by EBS's auditor Arthur Andersen ("Andersen"), EBS had to assign the contract to a joint venture and find another investor who would contribute and put at risk part of the equity in the joint venture and exercise at least partial control. EBS turned to nCube to be such an outside investor.

The formal arrangement between EBS and nCube (termed Project Braveheart) followed generally accepted accounting rules so that Andersen would approve EBS's proposal to post immediate profits. Allegedly, the true deal, however, did not follow those rules. It is alleged that in a secret side agreement it was understood between EBS and nCube that nCube's investment would be short term, that nCube would have no control over the joint venture,

and that nCube's equity would not be at risk because it would be bought out for the amount of nCube's initial investment plus a premium regardless of the performance of the joint venture. The contracts to execute the monetization were presented to Andersen, but the information regarding the true terms of Project Braveheart was withheld. Andersen approved the monetization.

The government alleged that the monetization led to EBS generating $53 million in false revenue in the fourth quarter of 2000, which allowed EBS to meet its earnings forecast. These false revenues were reported on Enron's year 2000 financial statements to the SEC.

In 2004, a grand jury indicted Howard and six other EBS executives on fraud, money laundering, and insider trading charges. That indictment contained charges based on Project Braveheart but also alleged the defendants more broadly conspired to deceive the investing public about the true state of EBS's communications network, its efforts to develop software, and its financial condition. Two of the defendants pleaded guilty prior to trial; Howard and the other four defendants were jointly tried in 2005. The jury acquitted on some counts and was unable to reach a verdict on others. The district court declared a mistrial on the counts on which the jury could not reach a verdict.

Subsequently, the government obtained a new indictment based solely on Project Braveheart, which charged Howard and Michael Krautz ("Krautz") with one count of conspiracy to commit wire fraud and to falsify Enron's books and records (Count 1), three counts of wire fraud (Counts 2–4), and one count of falsifying Enron's books and records (Count 5).[1] The first four counts of the

---

[1] Count 5 states in relevant part that Howard and Krautz,
together with conspirators and others, unlawfully, willfully, and knowingly did, directly and indirectly, falsify and cause to be falsified books, records and accounts which were subject to Section 13(b)(2) of the Securities and Exchange Act of 1934 which Enron was required to make and keep, accurately and fairly reflecting, in reasonable detail, the transactions and dispositions of the assets of Enron. Specifically, defendants HOWARD and KRAUTZ caused to be falsely

indictment charged Howard and Krautz with depriving Enron or its shareholders their rights to defendants' "honest services."[2]  Count 5 did not include this "honest services" language, but stated, inter alia, that Howard and Krautz "directly and indirectly, falsif[ied] and cause[d] to be falsified books, records and accounts . . . [and] caused to be falsely recorded as revenue EBS and Enron's earnings from Project Braveheart on Enron's books, records and accounts."

At trial, the government sought to prove the allegations of the indictment primarily through the testimony of Howard's alleged coconspirators.  Although many witnesses who had been involved with Project Braveheart were called to the stand, the government never established whether it was Howard or Krautz or one of the other coconspirators who actually falsified the books, records, or accounts of Enron as charged in Count 5.

Count 5 charges that Howard directly or indirectly falsified or caused the falsification of the books or records of Enron.  The government proceeded on the theory that the joint venture agreement with nCube and the accounting documents provided to Andersen were falsified and were the basis for Andersen's approval of the monetization plan and the documents filed with the SEC.  Howard testified at trial that despite his title as Chief Financial Officer of EBS, he had no oversight or control over the accounting department.  The government

recorded as revenue EBS and Enron's earnings from Project Braveheart on Enron's books, records and accounts in violation of Title 15 United States Code, Sections 78m(b)(2)(A) & (B), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2–1.

[2] Count 1 states in relevant part that Howard and Krautz, "together with coconspirators, did knowingly and intentionally conspire to . . . devise a scheme and artifice to defraud Enron and its shareholders, including to deprive them of the intangible right of honest services of its employees."  Counts 2–4 state in relevant part that Howard and Krautz, "together with others, having devised a scheme and artifice to defraud Enron and its shareholders, including to deprive them of the intangible right of honest services . . . did transmit and cause to be transmitted by means of wire communications . . . ."

established at trial through the testimony of Connie Lee, an accounting employee who answered to Krautz, that she and Krautz were responsible for preparing documents regarding Project Braveheart and providing and explaining them to Andersen. Connie Lee testified that she and Krautz both knew that they were withholding the relevant information regarding the true terms of Project Braveheart in their explanations and documents to Andersen, and did so to ensure that Andersen would approve the monetization and recognize the false profits.

The government, in rebuttal summation, linked Count 5 with the other counts, and stated for the jury that conspiracy was a legitimate avenue to convict for Count 5. Specifically, the government stated:

> that is why you should find defendant Howard guilty of conspiracy to commit wire fraud, that defendant Howard stole his honest services from Enron Corporation and from the investors of Enron, that he stole money and property, that is, payments made to him in income, made to him based upon his fraud, that he conspired to falsify or caused to be falsified the books and records of Enron. The same with Mr. Krautz, that is, you should find him guilty of Count 1 of the indictment. And the same as to Counts 2, 3, and 4, the wire fraud counts, as well as Count 5, the false books and records count. (emphasis added).

Additionally, the government requested that the district court instruct the jury that every coconspirator could be held criminally liable for the acts of every other coconspirator. The district court did so by providing a general Pinkerton instruction that Howard could be held liable for the acts of his coconspirators.[3]

---

[3] This jury instruction was:

Accordingly, the reasonable foreseeable acts, declarations, statements and omissions of any member of the conspiracy and in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be the acts of all of the members, and all of the members are responsible for each — for such acts, declarations, statements and omissions.

If you find, beyond a reasonable doubt, that the defendant whose guilt you are

The district court went further and gave specific Pinkerton instructions linking Count 1 regarding wire fraud to Count 5; these instructions stated that if the jury found the defendants guilty on the conspiracy count (Count 1), it could convict Howard under Count 5 even if he did not participate in the acts charged in that count so long as the entries were made by a coconspirator.[4] The jury returned a general verdict of guilty against Howard on all counts.

Prior to sentencing, this Court decided United States v. Brown, 459 F.3d 509 (5th Cir. 2006), cert. denied, 127 S. Ct. 2249 (2007). In Brown, employees of Enron and Merrill Lynch conspired to engage in a sham sale of Nigerian power barges. The purpose of the bogus sale was to allow Enron to book earnings on the sale and thereby meet its earnings targets for the fourth quarter of 1999. This Court held that an employee deprives his employer of "honest services" in this context only when the employee seeks to promote his own interests instead of the interests of the employer. Thus, there is no "honest services" violation "where an employer intentionally aligns the interests of the employee with a specific corporate goal, where the employee perceives his pursuit of that goal as

---

considering was a member of the conspiracy charged in the indictment, then, any acts done or statements made in furtherance of the conspiracy by persons also found by you to have been members of that conspiracy, may be considered against that defendant. This is so even if such acts were done and statements were made in the defendant's absence or without his knowledge.

[4] This jury instruction was:
A conspirator is responsible for offenses committed by other conspirators if the conspirator was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy.

Therefore, if you have first found a defendant guilty of the conspiracy charged in Count One and if you find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy, other conspirators committed the offenses in Counts Two through Five in furtherance of or as a foreseeable consequence of that conspiracy, then you may find a defendant guilty of Counts Two through Five even though the defendant may not have participated in any of the acts which constitute the offenses described in those counts.

mutually benefitting him and his employer, and where the employee's conduct is consistent with that perception of mutual interest." Id. at 522.

Relying on Brown, Howard moved to vacate his convictions on all five counts. He argued under our limitation in Brown on the use of an "honest services" theory by the prosecution in a fraud case that his conduct did not fall within the meaning of that term. As to Count 5, which did not include the "honest services" language, Howard argued that the conviction must be vacated on that count because the Pinkerton jury instruction provided an avenue for the jury to convict on Count 5 based on its finding of guilt on the tainted conspiracy count even though Howard did not make the false entries or cause them to be made. Howard argued further that under Yates, because it was impossible to say that the jury did not convict him on the legally invalid theory, the conviction on this count must be vacated also. The government conceded that the conduct alleged in the first four counts did not fall within the new understanding of the "honest services" provision, so the government did not oppose Howard's motion as to those counts. The government argued, though, that the record indicated that the jury did not rely on the tainted conspiracy count to convict Howard on Count 5, and thus Count 5 should not be vacated.

The district court vacated Howard's conviction on all five counts. The court stated that although the jury "may or may not" have convicted Howard for Count 5 based on the conspiracy count, the general guilty verdict made it impossible to know whether the jury's conviction on Count 5 was based on the tainted conspiracy count. After review of the record, the district court concluded "there is a reasonable possibility that Howard's conviction on Count Five was indeed tethered to Count One" because it was not possible to find beyond a reasonable doubt that the jury convicted Howard on Count 5 "solely because of his own conduct, and not upon the conduct of another." The government timely appealed.

II.

A.

We review an order granting a new trial under an abuse of discretion standard. See Thomas v. Texas Dep't of Criminal Justice, 297 F.3d 361, 368 (5th Cir. 2002); United States v. O'Keefe, 128 F.3d 885, 894 (5th Cir. 1997) (citing United States v. Pankhurst, 118 F.3d 345, 353 (5th Cir. 1997)); Carson v. Polley, et al., 689 F.2d 562, 570 (5th Cir. 1982) (citing Reeves v. General Foods Corp., 682 F.2d 515, 519 n.6 (5th Cir. 1982); Shows v. Jamison Bedding, Inc., 671 F.2d 927, 930 (5th Cir. 1982); Conway v. Chemical Leaman Tank Lines, Inc., 610 F.2d 360, 362 (5th Cir. 1980)). This standard is necessarily deferential to the trial court because, while we have read the record, we have not seen the impact of witnesses on the jury or observed the demeanor of the witnesses ourselves. O'Keefe, 128 F.3d at 894 (citing United States v. Boyd, 55 F.3d 239, 242 (7th Cir. 1995)). Questions of law, however, are reviewed de novo. Id. (citing Munn v. Algee, 924 F.2d 568, 575 (5th Cir. 1991)). On mixed questions of law and fact, we review the underlying facts under an abuse of discretion standard but the conclusions to be drawn from those facts de novo. Id. at 894–95 (citing Ornelas v. United States, 517 U.S. 690 (1996)).

B.

In this appeal, the government argues that the district court erred in vacating Howard's conviction on Count 5. The decision in this case turns on the application of Yates, which holds that a conviction must be vacated if a legally invalid theory was submitted to the jury and it is impossible to tell whether the jury's verdict of guilt relied on the invalid theory. 354 U.S. at 312. In Yates, the defendants were charged with conspiring (1) to advocate the overthrow of the United States government and (2) to organize, as the Communist Party of the United States, with the intent of causing the overthrow of the United States government. Id. at 300. Having found one of the avenues for conviction legally

infirm, the Supreme Court ordered a new trial because there was "no way of knowing," from the general guilty verdict, whether the jury relied on the legally infirm theory. Id. at 311. This Court has consistently construed Yates to require vacating convictions where it is unclear whether the convictions rested on legally valid or invalid bases. See Brown, 459 F.3d at 518; United States v. Hanafy, 302 F.3d 485, 487 (5th Cir. 2002); United States v. Alexius, 76 F.3d 642, 647 n.11 (5th Cir. 1996); United States v. Smithers, 27 F.3d 142, 146–47 (5th Cir. 1994); United States v. Johns, 444 F.2d 58, 58–59 (5th Cir. 1971) (en banc).

Applying Yates to the facts of the instant case, we are satisfied that the district court did not abuse its discretion in determining that the conviction for Count 5 must be vacated. The jury may have found Howard guilty under Count 5 for his own acts or acts caused or directed by him. Alternatively, the jury may have concluded that although Howard was not guilty of personally making or causing to be made the false entries charged in Count 5, he was culpable because the false entries were made by a coconspirator in furtherance of the conspiracy charged in Count 1.

After a careful review of the record, we are satisfied a reasonable jury could have found that Krautz and Connie Lee, two coconspirators who were allegedly not under Howard's control, were responsible for making the false entries in the books and records. Neither Howard nor the government presented evidence of Howard's personal participation in actually falsifying Enron's books and records, and Connie Lee acknowledged her role in relaying the misinformation about this transaction to Andersen. As in Yates, it is impossible to determine whether the jury convicted Howard on Count 5 based on his guilt on the conspiracy count plus acts by Connie Lee, Krautz, or other coconspirators in making the false entries. The government asked the jury to convict on both the legally valid and legally invalid theories. Thus, the district court did not err in concluding that Yates requires vacating Count 5.

The government argues that Griffin v. United States, 502 U.S. 46 (1991), as opposed to Yates, controls because the conspiracy avenue for conviction has inadequate factual support. In Griffin, the Supreme Court held that a general guilty verdict on a multiple-object conspiracy charge need not be set aside if the evidence is inadequate to support conviction as to one of the objects, but not another. Id. at 59. The Court held that where there are multiple factual predicates to the charge, one of which is unsupported by the evidence at trial, one may conclude that the jury, which returned a general verdict of guilty, convicted on the factually supported charge. Id. The Court distinguished, however, between charges that are legally infirm and those that are factually infirm, concluding that jurors are equipped to reject a charge that is factually unsupported but are not equipped to reject a charge that is legally infirm. Id.[5] The Court thus concluded that submission to the jury of a factually inadequate theory does not require vacating a conviction that was supported by at least one alternate and adequate theory. Id. at 59–60.

For reasons discussed above, we are persuaded that the evidence could have supported Howard's conviction on Count 5 based on his guilt on the conspiracy charge plus evidence of conduct by a coconspirator. For reasons also explained above, the legally invalid theory from Count 1 infects Count 5. Thus, Griffin is inapplicable and Yates controls.

---

[5] The Court stated:

Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law — whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.

Griffin, 502 U.S. at 59 (citing Duncan v. Louisiana, 391 U.S. 145, 157 (1968)).

For reasons outlined above, we also reject the government's argument that there is no evidence that a coconspirator actually falsified the books and records. Our review of the record satisfies us that the jury could have determined that it was Krautz or Connie Lee who actually falsified the books and records, two coconspirators who were allegedly not under Howard's control or direction. Under this scenario of how the books and records were falsified, Howard may have been convicted on Count 5 based on the actions of coconspirators. For this reason, the district court did not abuse its discretion in determining that the jury may have relied on this evidence to convict Howard for Count 5 under a conspiracy theory, that a coconspirator not under Howard's control actually made the false entries in the books and records.

The government next argues that since Howard only challenges his conviction under Count 5 because of the Pinkerton instruction that links Count 1 to Count 5, and because Howard failed to object to the Pinkerton instruction at trial, we should review under the plain error standard. We disagree. The Pinkerton instruction is a correct statement of the law and had factual support from the record. Thus, there was no basis for objection at the time the charge was given, considering the conspiracy evidence produced by the government. Additionally, Howard did object to the "honest services" instruction, which at bottom is the legal impediment to his conviction.

The government argues, finally, that even if the jury relied on the conspiracy avenue from Count 1 to convict Howard on Count 5, it was harmless error. The government argues, here, that a conviction for conspiracy to commit the falsification of books and records in Count 5 necessarily would also require the conclusion that Howard directly participated in those acts. The government relies on two cases — United States v. Saks, 964 F.3d 1514 (5th Cir. 1992), and United States v. Holley, 23 F.3d 902 (5th Cir. 1994) — for the proposition that this Court has found legally erroneous jury instructions harmless in fraud cases

when the inevitable result of the fraudulent activity proved at trial established that the defendants participated in the scheme that justified their convictions on legally correct instructions. In both Saks and Holley, defendants were charged with bank fraud. The district courts gave the correct jury instruction that the jury could find the defendants guilty if they concluded that defendants' actions deprived the banks of money or property. The courts also gave the erroneous instruction that the jury could find the defendants guilty of bank fraud if the defendants' actions deprived the banks of the right to honest services. This Court found harmless error in both cases because the inevitable result of the scheme proved at trial was defrauding the banks of property interests, a valid theory of conviction. See Saks, 964 F.2d at 1521; Holley, 23 F.3d at 910.

For reasons discussed above, the record in this case persuades us that a reasonable jury could have based its conviction on the tainted conspiracy charge plus evidence that the false entries were made not by or at the direction of Howard but by a coconspirator. It necessarily follows that unlike in Saks and Holley, Howard's conviction on Count 5 predicated on a legally valid theory was not inevitable.

### III.

For the reasons stated above, the district court order to vacate Count 5 is affirmed.

AFFIRMED.