**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Bruce C. Bereano,

　　　　　*Petitioner-Appellant,*

　　　　v.

United States of America,

　　　　　*Respondent-Appellee.*

No. 12-6417

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:11-cv-00961-WMN)

Argued: December 5, 2012

Decided: February 8, 2013

Before MOTZ, KING, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Motz and Judge Diaz joined.

## COUNSEL

**ARGUED:** Timothy Francis Maloney, JOSEPH, GREEN-WALD & LAAKE, PA, Greenbelt, Maryland, for Appellant. Leo Joseph Wise, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Matthew M. Bryant, JOSEPH, GREENWALD &

LAAKE, PA, Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

## OPINION

KING, Circuit Judge:

Bruce C. Bereano appeals from the district court's denial of his petition for a writ of coram nobis. The petition, filed pursuant to the All Writs Act, 28 U.S.C. § 1651(a), alleged that the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), requires vacatur of Bereano's 1994 mail fraud convictions in the District of Maryland. Pursuant to the Fifth Amendment's Due Process Clause, the *Skilling* decision limited application of the statutory term "intangible right of honest services," found in 18 U.S.C. § 1346, solely to those mail fraud prosecutions involving bribery or kickbacks. *See* 130 S. Ct. at 2931.

Bereano's coram nobis petition was denied on February 28, 2012, when the district court concluded that no relief could be granted even though Bereano's honest services fraud scheme did not involve bribery or kickbacks. *See Bereano v. United States*, No. 1:11-cv-00961, 2012 WL 683545 (D. Md. Feb. 28, 2012) (the "Opinion").[1] That was so, the court reasoned, because Bereano had also executed a fraud scheme involving money and property, implicating the pecuniary fraud theory of mail fraud, which was not affected by the *Skilling* decision. *See United States v. Black*, 625 F.3d 386, 387 (7th Cir. 2010) (deeming pecuniary fraud theory of mail fraud to be unaffected by Supreme Court's decision in *Skilling*). Although the Government has conceded the existence of a *Skilling* error,

---

[1] The district court's unpublished Opinion is found at J.A. 2337-49. (Citations herein to "J.A. ____" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

the court satisfied itself that the error, though constitutional in nature, is harmless beyond a reasonable doubt. As explained below, we agree with the district court and affirm.

## I.

## A.

On May 26, 1994, the grand jury in the District of Maryland returned an indictment against Bereano, then a Maryland lawyer and lobbyist, charging him with eight counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346. The scheme underlying the charges was predicated on two separate theories of mail fraud, one derived from § 1341 and the other from § 1346.[2] More specifically, Paragraph 7 of Count One (in the portion of the indictment captioned "The Scheme and Artifice to Defraud") alleged that Bereano had devised a scheme and artifice to do the following:

> (a) defraud his lobbying clients of money and property by means of false and fraudulent pretenses, representations and promises, by submitting to his lobbying clients bills which included false statements of expenses incurred [the "pecuniary fraud theory"]; and

> (b) defraud his lobbying clients of their right to the loyal, faithful, honest, and unbiased service and performance of the duties of the defendant in his capacity as agent of said lobbying clients, free from willful omission, deceit, dishonesty, misconduct, fraud, self-

---

[2]Section 1341 of Title 18 criminalizes the use of the mail for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." Meanwhile, § 1346 of Title 18, entitled "[d]efinition of 'scheme or artifice to defraud,'" defines such a scheme to also include "a scheme or artifice to deprive another of the intangible right of honest services."

>    dealing and conflict of interest [the "honest services
>    fraud theory"].

J.A. 20.[3]

Paragraphs 8 through 18 of Count One (the balance of that portion of the indictment captioned "The Scheme and Artifice to Defraud") further described the scheme in some detail. Therein, the grand jury alleged that, during the relevant period, Bereano requested that employees of his Annapolis law firm, Bereano & Resnick, make contributions to various political candidates. Those contributions were reimbursed through law firm checks, often designated with false notations to conceal their true purposes. In addition, Bereano caused firm checks to be issued to certain of the firm's employees, ostensibly for office expenses. Those checks were then cashed and the proceeds delivered to Bereano. Bereano distributed such proceeds to various members of his family, who used the money for contributions to his political action committee (the "Bereano PAC"). Finally, Bereano falsely billed his firm's lobbying clients for such expense items as "legislative entertainment," thereby recovering the political contributions into the firm's coffers by disguising their true nature.

The scheme and artifice to defraud, described as aforesaid in Count One, was realleged by the grand jury in each of Counts Two through Eight. Thus, all eight counts relied on the same fraud scheme, and the charges were identical in all respects save one. That is, the final paragraph of each count, commonly characterized as the "charging paragraph," identified a specific mailing that was used to execute and attempt to execute the fraud scheme.[4] Specifically, in September and

---

[3]Paragraphs 1 though 6 of Count One provide background facts for the scheme and charging allegations. The scheme and artifice to defraud is detailed in Paragraphs 7 through 18 thereof.

[4]The mailing allegation of Count One, identifying the mailing of the law firm bill used to execute the scheme and artifice to defraud, is specified in Paragraph 19 thereof. The specific mailings underlying the other seven counts are found in Paragraph 2 of each of those counts.

October of 1990, four bills, ostensibly including charges for the law firm's expenses, were submitted to four of the firm's lobbying clients. The four clients allegedly responded by mailing checks back to the firm in payment of those bills. Bereano was charged with two mail fraud offenses relating to each of the four clients, one for the fraudulent bill mailed to the client and another for the client's check mailed back to the firm in payment of the bill. More particularly,

- Counts One and Two alleged that, for the purpose of executing and attempting to execute the scheme and artifice to defraud, a law firm bill was caused to be delivered by mail to, and a check thereafter received by the firm from, a client called Phillips Publishing;

- Counts Three and Four alleged that, for the purpose of executing and attempting to execute the scheme and artifice to defraud, a law firm bill was caused to be delivered by mail to, and a check thereafter received by the firm from, a client called Dental Benefit Providers;

- Counts Five and Six alleged that, for the purpose of executing and attempting to execute the scheme and artifice to defraud, a law firm bill was caused to be delivered by mail to, and a check thereafter received by the firm from, a client called Medical Mutual Liability Insurance Society of Maryland ("Medical Mutual"); and

- Counts Seven and Eight alleged that, for the purpose of executing and attempting to execute the scheme and artifice to defraud, a law firm bill was caused to be delivered by mail to, and a check thereafter received by the firm from, a client called Maryland Saltwater Sportsfisherman's Association ("MSSA").

During pretrial proceedings in the district court, Bereano sought dismissal of the indictment, contending, inter alia, that the "intangible right of honest services" provision of 18 U.S.C. § 1346 was unconstitutionally vague and thus violative of the Due Process Clause of the Fifth Amendment. The court denied Bereano's dismissal motion, and the matter proceeded to trial before a Maryland jury.

B.

During Bereano's trial, which was conducted in Baltimore over a three-week period in November of 1994, the prosecution presented evidence from approximately twenty-six witnesses, including law firm employees and clients, members of Bereano's family, and Maryland politicians.[5] Charlotte Verkouw, a former assistant to Sandra O'Hearn, the firm's bookkeeper, explained that O'Hearn had directed her, at Bereano's behest, to contribute $250 to a political campaign. That contribution was reimbursed to Verkouw by a firm check containing the false notation "reimbursement for computer paper." Verkouw was directed by O'Hearn to prepare several firm checks payable to O'Hearn, in random amounts, totalling approximately $2500. Verkouw explained how two of the firm's reimbursement checks, each for $300, were falsely characterized as "legislative entertainment," with the $600 aggregate sum then billed on a pro rata basis to the four lobbying clients identified in the indictment.

At O'Hearn's behest, paralegal Pam Young endorsed law firm checks issued in her name and returned them to O'Hearn. It was Young's understanding that the checks would be cashed and their proceeds delivered to Bereano. Christine Sat-

---

[5]Our recitation of the facts is largely drawn from evidence presented at Bereano's trial and from the factual recitations made in the Opinion. To the extent they are derived from the trial evidence, the facts are recited in the light most favorable to the Government, as the prevailing party. *See United States v. Jefferson*, 674 F.3d 332, 341 n.14 (4th Cir. 2012).

terfield, who held various positions in the firm, made several political contributions for Bereano and O'Hearn. Satterfield was reimbursed with firm checks that falsely reflected they were reimbursements for, inter alia, a typewriter and miscellaneous expenses. Hazel Hall, O'Hearn's mother, was directed by her daughter to make at least one political contribution that the firm reimbursed.

Bereano's parents each received $2500 in cash from their son, which they contributed to the Bereano PAC. Bereano's ex-wife made contributions to the Bereano PAC on behalf of herself and her daughter, and Bereano reimbursed her in cash for those contributions. Donna Robey Spencer, a former legislative assistant for Bereano, managed the Bereano PAC. Spencer made a contribution to a Maryland politician at the direction of O'Hearn, and was reimbursed with a law firm check containing the false notation "Reimbursement for office supplies." When a State Senator called with questions about Spencer's contribution, she informed other members of the firm's staff, including Bereano and O'Hearn, and refused to make any further contributions.

As a result of the Senator's inquiry to Spencer, O'Hearn destroyed most of the law firm's billing records for the period from May through September of 1990. O'Hearn did so, in part, because she had "written many more [political contribution] checks than the other girls in the office," all of which had been reimbursed by the firm. J.A. 1126. In addition to such contributions, and in order to provide Bereano with cash that he had requested, O'Hearn wrote and cashed firm checks totalling about $2500. O'Hearn, who was responsible for generating the firm's bills to its lobbying clients, asserted that there was no established firm practice of falsely billing lobbying clients for political contributions. Before the grand jury, however, she had confirmed that Bereano had his lobbying clients billed for prorated portions of such contributions, falsely characterized on the bills as "legislative expenses." When the prosecutors used O'Hearn's grand jury transcript to

impeach her testimony, she disavowed any recollection thereof and offered no explanation for the inconsistencies.

Of particular relevance, two of the law firm's check stubs for August 14, 1990, had not been destroyed. Those check stubs identified two firm checks to O'Hearn for $300 each. The two checks were reimbursements for political contributions that O'Hearn made at Bereano's request, but the check stubs falsely reflected that they were reimbursements for a printer and a filing cabinet. The Memo Line on each stub included the notation "110," the firm's billing category for "legislative entertainment," as well as the phrase "per BCB," Bereano's initials.

One of the $300 check stubs identified two lobbying clients, Phillips Publishing and Dental Benefit Providers, and specified their law firm account numbers. Half of the $300 referenced on that stub was falsely billed to Phillips Publishing for "legislative entertainment." The remaining $150 was falsely billed to Dental Benefit Providers, also as "legislative entertainment." The second $300 check stub identified two additional lobbying clients, Medical Mutual and MSSA. Half of the $300 referenced on that stub was falsely billed to Medical Mutual as "legislative entertainment." The remaining $150 was then billed to MSSA with the same false notation.

The two $300 reimbursement checks paid to O'Hearn on August 14, 1990, along with the four law firm bills, each dated September 1, 1990, were used to recoup $600 to the firm for its political contributions. Those false bills gave rise to the eight mailings that underlie the charging paragraphs of the indictment. That is:

- Count One related to the September 1, 1990 firm bill mailed to Phillips Publishing;

- Count Two related to the check mailed to the firm by Phillips Publishing in payment of its bill;

- Count Three related to the September 1, 1990 firm bill mailed to Dental Benefit Providers;

- Count Four related to the check mailed to the firm by Dental Benefit Providers in payment of its bill;

- Count Five related to the September 1, 1990 firm bill mailed to Medical Mutual;

- Count Six related to the check mailed to the firm by Medical Mutual in payment of its bill;

- Count Seven related to the September 1, 1990 firm bill mailed to MSSA; and

- Count Eight related to the MSSA check to the firm in payment of its bill.

Finally, representatives of the four lobbying clients (Phillips Publishing, Dental Benefit Providers, Medical Mutual, and MSSA) confirmed that they had retained Bereano as their lobbyist. They also acknowledged that the reimbursements billed to their employers by the law firm for "legislative entertainment" had been paid. Bereano, however, was never authorized to bill the lobbying clients for any political contributions made by the firm or its employees.

The prosecution concluded its case against Bereano on November 22, 1994. The district court thereafter denied Bereano's motion for judgment of acquittal, save on Count Eight. On that charge, the court deemed the evidence insufficient to support a finding that MSSA had used the mail in paying its bill.[6]

---

[6]To avoid confusion by the jury, the district court deferred implementation of its Count Eight ruling until after the jury returned its verdict.

On November 23, 1994, Bereano rested without presenting any evidence in defense of the charges. After a short break for Thanksgiving, the trial moved toward its conclusion with closing arguments and the district court's instructions on, inter alia, the elements of mail fraud. Consistent with the law as it then existed, the court advised the jury (pursuant to 18 U.S.C. § 1346) that "the first element that I gave you [the fraud scheme] means that the government must prove beyond a reasonable doubt that there was a scheme or artifice to defraud or to obtain money or property *or the intangible right to honest services* by means of false or fraudulent pretenses, representations or promises." J.A. 1906 (emphasis added). The court continued, explaining that "[a] scheme to defraud is any plan, device or course of action to obtain money or property *or to deprive another of the intangible right of honest services*." *Id.* (emphasis added). Thus, in its explanation of the first element, and again in defining a "scheme to defraud," the court instructed the jury, using the disjunctive "or," that it was entitled to convict Bereano if it found him guilty under either the pecuniary fraud theory or the honest services fraud theory.

On November 30, 1994, the jury found Bereano guilty on all eight Counts. In so doing, the jury returned a "general verdict" on each count, that is, it checked the line on the verdict form reflecting that Bereano was, in each instance, "Guilty." J.A. 1929-30. Neither the instructions nor the verdict form requested a specification of whether Bereano was convicted under the pecuniary fraud theory, the honest services fraud theory, or both. On April 21, 1995, the trial court imposed sentence, which was stayed during the pendency of an appeal.[7]

---

[7]Prior to sentencing, the district court implemented its earlier decision and acquitted Bereano on Count Eight. The judgment order thus reflected his convictions and sentence on Counts One through Seven.

C.

On appeal to this Court, Bereano maintained, inter alia, that "application of § 1346 to him overreached constitutional bounds." *See United States v. Bereano*, No. 95-5312, 1998 WL 553445, at *5 (4th Cir. Aug. 28, 1998) (unpublished). After observing that "[s]ending a false bill to a third party through the mails . . . is a classic violation of the mail fraud statute," we rejected Bereano's constitutional contention and explained that, by enacting § 1346, "Congress meant to return the definition [of honest and faithful services] to its [earlier] scope," which covers

> not only circumstances where an agent defrauds his principal by stealing money from the principal, but also where an agent defrauds his principal of his "honest and faithful services" when he breaches his fiduciary duty and conceals material information from his principal, coupled with the necessary intent and use of the mails and wires.

*Id.* at *4-6.

Our decision also rejected Bereano's other appellate contentions, but agreed with the prosecution that the district court had erred at sentencing. *See Bereano*, 1998 WL 553445, at *17. Accordingly, we vacated Bereano's sentence and remanded for resentencing. *Id.* Bereano was ultimately resentenced and fined. Bereano has long since served his sentence and paid his fine.

II.

A.

As the district court recognized, Bereano was convicted of seven mail fraud offenses and prosecuted under both the pecuniary fraud theory and the honest services fraud theory.

Section 1346 of Title 18 was enacted by Congress in 1988 in response to the Supreme Court's 1987 decision in *McNally v. United States*, 483 U.S. 350 (1987). Prior to *McNally*, the courts had interpreted the mail fraud statute, 18 U.S.C. § 1341, to authorize a mail fraud prosecution for a scheme "to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly." *Id.* at 358. The *McNally* Court ruled that Congress had never intended such a broad application of the mail fraud statute. The Court thus construed § 1341 "as limited in scope to the protection of property rights." *Id.* at 360. It explained that "[i]f Congress desires to go further, it must speak more clearly than it has." *Id.*

In response to *McNally*, Congress spoke swiftly, enacting § 1346 within the following year. As enacted, § 1346 provides as follows: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Thereafter, until the *Skilling* decision partially repudiated the honest services fraud theory in 2010, the Government relied extensively on § 1346 to prosecute "honest services fraud."

During its October 2009 Term, the Supreme Court rendered its decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010). In *Skilling*, an appeal by a former Enron executive, the Court circumscribed the prosecution's use of § 1346 in mail fraud prosecutions, limiting it to those cases involving actual bribery or kickbacks, which the Court characterized as having been the "core of the pre-*McNally* case law" relating to honest services fraud. *Id.* at 2931. Any application of § 1346 beyond the scope of such bribes and kickbacks "violates the Due Process Clause of the Fifth Amendment." *Id.* at 2935 (Scalia, J., concurring).

B.

In reliance on *Skilling* and its companion decision in *Black v. United States*, 130 S. Ct. 2963 (2010), Bereano initiated

this proceeding in the district court on April 12, 2011, seeking coram nobis relief to vacate his mail fraud convictions and secure repayment of his fine. In response, the Government conceded that, because there were no allegations of bribery or kickbacks in the indictment, the jury instructions in Bereano's trial regarding the honest services fraud theory unconstitutionally authorized the jury to convict Bereano under that repudiated theory, in contravention of *Skilling*. The Government contended, however, that Bereano could not have been convicted of the mail fraud charges without the jury also concluding that he was guilty under the pecuniary fraud theory, that is, that he had used the mail to defraud four of his lobbying clients of their money and property.

By its Opinion of February 28, 2012, the district court agreed with the Government, denying coram nobis relief and concluding that the *Skilling* error — though constitutional in nature — was harmless beyond a reasonable doubt. *See* Opinion 13. In reaching that conclusion, the Opinion observed that "[t]he core of the Government's case was the fraudulent billing scheme, which is primarily about money." *Id.* at 9. Bereano has timely noticed this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

III.

On appeal from a district court's denial of a petition for a writ of coram nobis, we review factual findings for clear error, questions of law de novo, and "'the district court's ultimate decision to deny the writ for abuse of discretion.'" *United States v. Akinsade*, 686 F.3d 248, 251-52 (4th Cir. 2012) (quoting *Santos-Sanchez v. United States*, 548 F.3d 327, 330 (5th Cir. 2008), *abrogated on other grounds by Padilla v. Kentucky*, 130 S. Ct. 1473 (2010)). We generally review de novo any mixed questions of law and fact. *United States v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010).

IV.

A.

The authority of a federal court to issue a writ of coram nobis derives from the All Writs Act, codified at 28 U.S.C. § 1651(a). Section 1651(a) authorizes the federal courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."[8] At common law, the writ of coram nobis was available only "to correct errors of fact," enabling a petitioner "to avoid the rigid strictures of judgment finality by correcting technical errors such as happened through the fault of the clerk." *United States v. Denedo*, 556 U.S. 904, 910-11 (2009) (internal quotation marks omitted). In its modern form, however, "*coram nobis* is broader than its common-law predecessor" and "can issue to redress a fundamental error . . . as opposed to mere technical errors." *Id.* at 911.

B.

1.

In order for a district court to reach an ultimate decision on coram nobis relief, a petitioner is obliged to satisfy four essential prerequisites. First, a more usual remedy (such as habeas corpus) must be unavailable; second, there must be a valid basis for the petitioner having not earlier attacked his convictions; third, the consequences flowing to the petitioner from his convictions must be sufficiently adverse to satisfy Article III's case or controversy requirement; and, finally, the

---

[8]Although the adoption of Federal Rule of Civil Procedure 60(b) in 1946 abolished the writ of coram nobis in civil cases, coram nobis remains available to challenge a criminal conviction. As the Supreme Court has explained, "[s]uch a motion is a step in the criminal case and not, like habeas corpus where relief is sought in a separate case and record, the beginning of a separate civil [p]roceeding." *United States v. Morgan*, 346 U.S. 502, 505 n.4 (1954).

error that is shown must be "of the most fundamental character." *United States v. Akinsade*, 686 F.3d 248, 252 (4th Cir. 2012).

The Government does not contest the proposition that Bereano has satisfied the first three of the foregoing prerequisites for coram nobis relief. First, having served his sentence and paid his fine, the usual postconviction remedy of habeas corpus is not available. Second, Bereano's reason for not launching an earlier attack on his convictions is a valid one, in that the Supreme Court only recently rendered the primary decision on which he relies, *Skilling v. United States*, 130 S. Ct. 2896 (2010).[9] Third, Bereano is yet burdened with multiple felony convictions for which he has suffered substantial adverse consequences, e.g., being disbarred from the practice of law. Those consequences are sufficient to satisfy the case or controversy requirement of Article III. *See United States v. Mandel*, 862 F.2d 1067 (4th Cir. 1988) (affirming award of coram nobis relief on basis of *McNally*).

2.

We thus turn to a more robust analysis of the fourth prerequisite for coram nobis relief — whether the *Skilling* error conceded by the Government is "of the most fundamental character." That terminology derives from a Supreme Court decision of long standing, where the Court emphasized that an error "of the most fundamental character" is one that has "rendered the proceeding itself irregular and invalid." *United States v. Mayer*, 235 U.S. 55, 69 (1914). More recently, the Court explained the circumscribed use of coram nobis when it directed that "judgment finality is not to be lightly cast aside; and courts must be cautious so that the extraordinary remedy of *coram nobis* issues only in extreme cases."

[9]The *Skilling* decision was issued by the Supreme Court on June 4, 2010. Bereano filed his coram nobis petition in the district court ten months later, on April 12, 2011.

*Denedo*, 556 U.S. at 916; *see also Carlisle v. United States*, 517 U.S. 416, 429 (1996) ("[I]t is difficult to conceive of a situation in a federal criminal case today where a writ of *coram nobis* would be necessary or appropriate." (internal quotation marks omitted)). Our sister circuits have fairly consistently been of a similar view. *See Thomas v. U.S. Disciplinary Barracks*, 625 F.3d 667, 670 n.3 (10th Cir. 2010) (explaining that an error must be "so fundamental as to render the proceedings themselves irregular and invalid; in the interests of promoting the finality of appeals, the standard for obtaining relief through *coram nobis* is more stringent than the standard applicable on direct appeal"); *United States v. Bruno*, 903 F.2d 393, 396 (5th Cir. 1990) (describing an error "of the most fundamental character" as one "that has resulted in a complete miscarriage of justice").

In this proceeding, the Government concedes that a constitutional error occurred in Bereano's trial when the district court erroneously instructed the jury that it could convict Bereano on the honest services fraud theory. Thus, we must determine whether that instructional error was so serious as to be, in terms of the fourth prerequisite of coram nobis, an error "of the most fundamental character." In answering this inquiry, we will initially examine whether the *Skilling* error would have entitled Bereano to relief by way of a direct appeal. We utilize that analysis because an appellant who would not be entitled to relief on direct appeal could never be entitled to the extraordinary writ of coram nobis. *See Mandel*, 862 F.2d at 1074 (assessing availability of relief on direct appeal before examining propriety of coram nobis relief); *see also Akinsade*, 686 F.3d at 252-53 (examining merits of constitutional claim in order to determine whether error is "of the most fundamental character").[10]

---

[10]Due to the extraordinary nature of the coram nobis writ, and because it is a form of postconviction relief, several of the federal courts have utilized habeas corpus procedures in resolving coram nobis petitions. *See United States v. Chaidez*, 655 F.3d 684, 687 (7th Cir. 2011) ("Because a

Pursuant to the Supreme Court's decision in *Yates v. United States*, when a general verdict of guilty rests on two alternative theories of prosecution, one valid and the other invalid, the verdict should be set aside if it is "impossible to tell which ground the jury selected." 354 U.S. 298, 312 (1957). As we later recognized in *United States v. Hastings*, however, an alternative-theory error is nevertheless subject to harmless error review. *See* 134 F.3d 235, 241-42 (4th Cir. 1998). In *Hastings*, Judge Wilkins assumed that an erroneous instruction concerning an element of the charged offense was constitutional error. Our decision explained that, in such circumstances, the reviewing court

> must attempt to ascertain what evidence the jury necessarily credited in order to convict the defendant under the instructions given. If that evidence is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed.

*Id.*

Later, in *Neder v. United States*, the Supreme Court reached the same result, recognizing that a failure to properly instruct on an element of the offense is a constitutional error

---

writ of error coram nobis affords the same general relief as a writ of habeas corpus, . . . we proceed as we would in a habeas case." (internal citation omitted)); *United States v. Mandanici*, 205 F.3d 519, 527 (2d Cir. 2000) (same); *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996) (same). Indeed, at least one district court has denied a *Skilling*-based coram nobis petition on the basis of the one-year statute of limitations applicable to proceedings under 28 U.S.C. § 2255. *See United States v. Woodward*, No. 1:95-cr-10234, 2012 WL 4856055 (D. Mass. Oct. 10, 2012). Such an approach has not been suggested by the parties to this appeal, however, and neither *Mandel* nor *Akinsade* utilized any habeas corpus procedural principles for guidance.

subject to harmlessness review. *See* 527 U.S. 1, 4 (1999) (citing *Chapman v. California*, 386 U.S. 18 (1967)). The *Skilling* decision endorsed the harmless error precedent, further emphasizing that, although "constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may rest on a legally invalid theory," that determination "does not necessarily require reversal." 130 S. Ct. at 2934 (citing *Yates*, 354 U.S. 298). Indeed, after the Court remanded *Skilling* and its companion case, *Black v. United States*, 130 S. Ct 2963 (2010), to the Fifth and Seventh Circuits, those courts applied harmless error review to identified *Skilling* errors. *See United States v. Skilling*, 638 F.3d 480, 481-82 (5th Cir. 2011) (applying *Neder* harmless error review to *Skilling* error); *United States v. Black*, 625 F.3d 386, 388 (7th Cir. 2010) (same).

In its Opinion, the district court correctly recognized the applicability of *Neder*'s harmless error standard in Bereano's coram nobis proceeding, and then ruled against him. *See* Opinion 5-6. Less than a month thereafter, our decision in *United States v. Jefferson* ratified the *Neder* harmless error standard as the law of this Circuit with respect to *Skilling* error. *See* 674 F.3d 332, 361 (4th Cir. 2012). In *Jefferson*, we explained that an appellate court is obliged to deny relief on direct appeal if it concludes "'beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *Id.* at 360 (quoting *Neder*, 527 U.S. at 18). We spelled out the applicable harmless error test as follows:

> [I]f the evidence that the jury necessarily credited in order to convict the defendant under the instructions given . . . is such that the jury must have convicted the defendant on the legally adequate ground in addition to or instead of the legally inadequate ground, the conviction may be affirmed.

*Id.* at 361 (internal quotation marks omitted).

In concluding that the Government had satisfied its burden of establishing harmlessness beyond a reasonable doubt, the district court correctly recognized that "[t]he core of the Government's case was the fraudulent billing scheme, which is primarily about money." Opinion 9.[11] The court expounded on the foregoing characterization of the prosecution's case in the following terms:

> [I]t would be inconsistent for the jury to convict Bereano of honest services fraud but find him innocent of pecuniary fraud. A conviction based on honest services fraud necessarily acknowledges that the jury accepts as true the scheme the Government has alleged, that Bereano knowingly took advantage of his client[s'] trust by sending them false bills. *In accepting that this scheme took place, the jury also necessarily accepted that Bereano knowingly obtained his clients' money by false pretenses, a finding that equates to a conviction for pecuniary fraud.*

*Id.* at 9-10 (emphasis added). The court's characterization is consistent with our decision rejecting Bereano's direct appeal

---

[11]The district judge who resolved the coram nobis proceedings against Bereano was the same judge who presided over Bereano's criminal trial more than fifteen years earlier. In this circumstance, the Opinion's characterization of the prosecution's case — i.e., that "[t]he core of the Government's case was the fraudulent billing scheme" — may be entitled to some degree of deference, either as a factual finding or as a determination of a mixed question of law and fact. As a factual finding, it would be subject to clear error review. Although mixed questions of law and fact are ordinarily reviewed de novo, the Supreme Court has recognized that "deferential review of mixed questions of law and fact is warranted when it appears that the district court is 'better positioned' than the appellate court to decide the issue in question." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 233 (1991). Out of an abundance of caution, we review de novo the court's characterization of the trial evidence. Having done so, we readily ratify that characterization — that "[t]he core of the government's case was the fraudulent billing scheme" — as the only appropriate one.

fifteen years ago, where we explained that "[s]ending a false bill to a third party through the mails with the necessary criminal intent is a classic violation of the mail fraud statute." *United States v. Bereano*, No. 95-5312, 1998 WL 553445, at *4 (4th Cir. Aug. 28, 1998) (unpublished).

Our independent application of the harmless error standard in these circumstances confirms the district court's determination that, at Bereano's trial, the prosecution presented overwhelming evidence that he had schemed to commit pecuniary fraud. Not only was the evidence of pecuniary fraud more than sufficient, it was necessarily accepted by the jury, as reflected in the verdict. Put succinctly, the jury could not have found Bereano guilty of mail fraud under either the honest services fraud theory or the pecuniary fraud theory without concluding that the alleged mailings — false bills mailed to lobbying clients and the clients' payments mailed in satisfaction thereof — were an integral part of the fraud scheme. In other words, no reasonable jury could have acquitted Bereano of pecuniary fraud for falsely billing his clients, but convicted him of honest services fraud for the same false billing scheme. *See Black*, 625 F.3d at 393 ("No reasonable jury could have acquitted the defendants of pecuniary fraud on this count but convicted them of honest-services fraud.").

Because Bereano would not be entitled to relief on direct appeal under *Skilling*, the fourth prerequisite for coram nobis relief — identification of "an error of the most fundamental character" — is not satisfied. Accordingly, an award of the "extraordinary" remedy of coram nobis relief is unwarranted.

V.

Pursuant to the foregoing, the judgment of the district court is affirmed.

*AFFIRMED*