Filed 3/22/22  P. v. Gonzalez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C086562 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF-16-4909) |
| v. | |
| JUSTIN MATTHEW GONZALEZ et al., | |
| Defendants and Appellants. | |

A jury convicted defendants Justin Matthew Gonzalez and Alexis Ivan Velazquez of the murder of Ronald Antonio.[1]  Gonzalez and Velazquez, who belonged to the Varrio Bosque Norteño gang (also known as VBN), evidently mistook Antonio for a rival gang member.  Gonzalez held Antonio and Velazquez stabbed him.

---

[1] The defendants' briefs refer to the victim as Ronald Antonio Fontanilla.  Witnesses at trial, including the victim's sister, refer to him as Ronald Antonio, as do we.

1

The jury found Gonzalez guilty of second degree murder (Pen. Code, § 187)[2] and Velazquez guilty of first degree murder (§§ 187, 189). The jury also found Gonzalez guilty of criminal street gang activity (§ 186.22, subd. (a)) and found true the allegation that he murdered Antonio for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). In Velazquez's case, the jury found that he personally used a dangerous or deadly weapon to kill Antonio (§ 12022, subd. (b)(1)) and committed the murder for the benefit of the gang (§ 186.22, subd. (b)(1)). Gonzalez was sentenced to 70 years to life plus 20 years for two prior convictions. Velazquez was sentenced to life without parole.

Gonzalez contends that Senate Bill No. 1437 (2017-2018 Reg. Sess.), which adopted section 1170.95 eliminating the natural and probable consequences doctrine as it relates to murder, is retroactive to his case and requires reversal of his murder conviction. In supplemental briefing, Gonzalez further asserts that Senate Bill No. 775 (2021-2022 Reg. Sess.) also applies retroactively and permits him to raise the elimination of the natural and probable consequences doctrine on direct appeal. The Attorney General concedes Senate Bill No. 1437 and Senate Bill No. 775 apply retroactively, but argues that based on the record Gonzalez is not entitled to reversal. We disagree. Therefore, we reverse Gonzalez's conviction for second degree murder. As Gonzalez's other claims are moot in light of this conclusion, we do not address them.

Velazquez's sole contention on appeal is that the trial court erred in responding to the jury's question regarding the meaning of the phrase "knowing the consequences" in CALCRIM No. 521, the pattern instruction on first degree murder. We find no error in the court's answer, which was appropriately based on *People v. Cordero* (1989) 216 Cal.App.3d 275, 282 (*Cordero*).

---

[2]  All undesignated statutory references are to the Penal Code.

## FACTUAL BACKGROUND

On August 30, 2016, Yair C., a former Norteño gang member, was living in the Casa del Sol mobile home park. When he was active in the Norteño gang, he had heard the term "Scrap" used as a disrespectful reference to the rival Sureño gang. He identified Gonzalez (known to him as "Bandit") and Velazquez (known as "Oso") in court as two men he frequently saw in the unit next door where two women lived. At about 8:30 p.m. on August 30, Gonzalez with Velazquez came up to Yair C. and asked him if he was a Scrap and "if I bang." He understood that Norteños used the question "[d]o you bang?" to determine if an individual is associated with the Sureño gang. Velazquez also said the word "Bosque." Yair C. knew that if he did not confirm that he was an active Norteño— that is, if he was a dropout from the gang or a Sureño—his response could lead to violence. He told Gonzalez and Velazquez that he did not bang. The women from next door grabbed Gonzalez and Velazquez and told them to leave Yair C. alone.

Aaron Moe, a gang investigator from the Yolo County District Attorney's Office, explained that Varrio Bosque Norteño or VBN is a Norteño-affiliated street gang in Woodland, California. VBN claims control of Woodland. Based on his review of the evidence in the case, Investigator Moe testified that, on August 30, 2016, Gonzalez and Velazquez were active members of VBN.

Investigator Moe testified that "hood checking" involves a gang member confronting individuals not known to the area or the gang and determining their gang association by looking at tattoos or clothing or by their responses to questions. Active VBN members hood check people in Woodland. A confrontation can turn violent if the individual answers to being a Sureño.

At about 10:30 p.m. on August 30, 2016, Marco A., a resident of Casa del Sol and a former Norteño, had come home from work and was walking his dog. He was confronted by two Hispanic men. Marco A. told them he did not want any problems. He tried to back up but they kept coming forward and pushing against him. One of them was

3

trying to calm the other. Marco A. was wearing his blue work uniform. Blue is the color associated with the Sureño gang. The men were asking him who he was and where he was from. He assumed they were gang members and were asking about gang association because of his blue clothes. Marco A. had a knife and pulled it out. The blade flipped out on its own and he put it away, continuing to say that he did not want problems. When the men kept backing him up, Marco A. took off and went home.

That evening Pedro M. was talking to Antonio outside Pedro M.'s unit at Casa del Sol. The two men left to walk to a nearby bar at about 10:00 p.m. to play a game of pool. Just before they got to the trailer park office, a car pulled up and some women got out screaming. One of them was bleeding. Pedro M. told Antonio to keep on walking. The women stopped screaming and got in the car to leave. One of the women said she wanted to borrow Pedro M.'s shirt but he refused and kept on walking. The woman stopped Antonio and he gave her his shirt to stop the bleeding. Pedro M. kept walking. When he turned around, he didn't see anybody. He turned back towards his house but heard screaming and a lot of running and yelling. He decided to walk to his house, keeping his head down. When he got to the house, Antonio was lying by the front doorsteps and his stepdaughter Sara D. was calling 911.

Earlier Sara D., who was visiting her mother at Casa del Sol, had heard people screaming. She asked her mother where Pedro M. was, looked out the living room window, and saw some people and a man with an eight- to 10-inch knife. The man had long hair and a beard and was wearing a white shirt. Sara D. heard a knock on the door but was scared to open it. She waited "a little bit" and then opened it. She saw Antonio lying on the stairs bleeding. He couldn't talk. She knew he was dying because his breathing was labored. She saw a lot of blood. Antonio wasn't wearing a shirt. She called 911.

Sara D. looked around and saw people running. Some minutes passed and a tall, thin White girl with red and orange hair came up. Sara D. asked the girl if she saw

4

anything, if she knew who did it.  The girl said, "Oh, my God, I can't believe they did this."  When she asked the girl again if the girl knew who did it, the girl said, "Yes, El Oso."

Isaiah M. was living in Casa del Sol on August 30, 2016.  That night he heard two Latina women arguing in his front yard.  After they left, he went outside to take out the trash, saw Antonio and Pedro M. passing by, and greeted them.  Then he heard screaming, walked around the corner, and saw Antonio taking off his shirt and giving it to a woman.  The woman wrapped up her arm with it.  Isaiah M. saw blood on her shirt and arm.  He walked over and asked if she needed help or wanted him to call an ambulance.  He saw that she was cut from the right elbow to the forearm, about three to four inches, and bleeding a lot.  She was using Antonio's shirt to stop the bleeding.  The woman said, "Is that him?"  Isaiah M. asked again if she needed him to call an ambulance or the police, and she said, "No.  You did this to me . . . you fucking Scrap."  He knew that the word "Scrap" was a derogatory term that a Norteño used for a Sureño.  He had heard the word before though he was never in a gang.  He asked what she was talking about.  She opened a little, one-inch-blade knife and kicked him three times in the leg.

Isaiah M. turned and ran.  He saw Antonio watching at the corner.  Antonio said, "Don't hurt me."  Isaiah M. told Antonio that he didn't do anything and should go hide in his house.  Antonio started running.  Isaiah M. saw two Hispanic men running from the entrance of the park towards him, one wearing a white shirt and one wearing a black shirt, both with short hair.  One of them yelled, "Bosque," which he had heard before referring to a Norteño gang.  He ran to his father-in-law's trailer and called 911.

Raquel P. lived at Casa del Sol on August 30, 2016.  She saw Antonio, her neighbor, get stabbed that night.

Raquel P. saw two young men, neighbors who lived up the street, coming towards her when she left her trailer to check her mail at about 9:45 p.m.  She also saw two women in a white van arguing.  One of them was driving and the other was outside the

5

van yelling, "No. Nina. Don't go. Don't go." A third woman—who looked "American," with strange hair that could have been a wig—came up, pointed in Antonio's direction, and yelled to the two men, "Come here. This is where the piece of shit is at." The men ran in the direction she was pointing.

One of the men had a knife. He had long hair and a beard. The knife was long with a white handle. The other man was clean-shaven, thin and taller than the man with the weapon. Both men were wearing blue pants and white T-shirts.

Raquel P. testified that Antonio was trying to get to his house but the men stopped him. The man with long hair had the weapon in his hand. The other man wrapped his arms around Antonio from behind. Antonio tried to get away but there were two people attacking him. The man with the knife grabbed Antonio by the hand and stabbed him twice. The men let go of Antonio, he fell down, and they ran off. Antonio tried to get up and walk. He crawled to his neighbor's house, knocked on the door, and fell backwards onto a wooden bench.

Raquel P. stood still with her head lowered because she was afraid. The men ran past her and were gone when she turned her head. Five minutes later, the American woman came up and saw Antonio bleeding on the ground. She said, "Oh, my fucking God. The fucking Oso did. He really did."

The police brought out four males for Raquel P. to view at the scene. She identified a young man with long hair as the man who stabbed Antonio. The man she described as the stabber was Velazquez. She identified that man in court as Velazquez.

At the scene, Raquel P. could not identify Gonzalez as the man with Velazquez. The next day she could not identify Gonzalez in a photo lineup. At trial, she did identify Gonzalez as the person who held Antonio while Velazquez stabbed him.

On August 30, 2016, at about 11:00 p.m., Cristian H. was in his car with friends in front of his home at Casa del Sol. He saw a man chasing Antonio. Both men fell down and got up again. He got out of his car and was standing in front of his house. Cristian

6

H. heard Antonio screaming something like, "Oh, don't" or "No, don't do it." Antonio put his hands out, palms in front of him. Cristian H. saw the other man pull something out of his waist and it looked as if he was stabbing Antonio. When Cristian H. went to where the men were, he saw a trail of blood and the body of Antonio. The man stabbing Antonio was tall and had long hair.

Ruby Aradoz attended most of the trial as a codefendant. On December 1, 2017, Aradoz entered into an agreement to plead guilty to being an accessory after the fact to a felony (§ 32). The prosecutor agreed to dismiss that charge if Aradoz provided truthful testimony and cooperated with the prosecution.

Aradoz testified she had been drinking vodka before going to Casa del Sol on August 30, 2016, and was very intoxicated. A lot of things were blacked out and a blur to her. She could remember parts of that night and testified to the parts she remembered.[3]

On August 30, Aradoz went to Casa del Sol in a car with some friends between 9:00 and 10:00 p.m. to get food at the trailer of a friend. After they parked the car, her friends went on foot to the trailer and Aradoz stayed in the car.

Aradoz remembered being in the parking lot for a while. She remembered talking to a Hispanic man on a bicycle. When he left, Aradoz noticed she was bleeding from a four- to five-inch laceration on her right arm. She did not know the man or remember their conversation.

She approached two men and asked for help. She asked if they knew what happened to her or who did it. She asked one of the men for his shirt to stop the bleeding and he gave it to her.

---

[3] For example, Aradoz could not remember contact with Isaiah M. or her calling him a "Scrap," but she did not deny it occurred. She had blacked out. Aradoz heard Isaiah M. testify that she had a knife. She testified it was possible but unlikely.

Aradoz walked away from the men, wrapping her arm in the shirt. Then there was a commotion. She saw a man she knew as Oso turning the corner and running down the street. Her middle name is Morning Feather. He pointed at her and said, "Feather," more as a question. She ran in the same direction. Gonzalez was running behind Velazquez and Aradoz's friend was running as well.[4]

Next, Aradoz remembered Velazquez and Gonzalez having a physical altercation with a person who she later found out was Antonio. It seemed like a fistfight but she didn't see any punches thrown. Antonio was on the ground and the two men were on top of him on their knees. Aradoz then saw Velazquez standing over Antonio with a big kitchen knife. Aradoz walked away with her friend.

Gonzalez approached Aradoz and her friend. He was cursing. He had a knife in his hand. It was a kitchen knife that was as long as the knife Velazquez had, but not as wide. Aradoz's friend told Gonzalez to leave them alone. Gonzalez walked back to Velazquez.

Aradoz did not see the knives until after the altercation with Antonio. Aradoz did not see either attacker stab Antonio. Aradoz and her friend walked back to her car and went to UC Davis Medical Center.

Aradoz identified Velazquez and Gonzalez in court as the men who attacked Antonio.

Antonio was 41 when he was murdered. He had grown up in Casa del Sol. Antonio had been working at Big O tires for seven or eight years at the time of his death. He was living with and caring for his elderly father, who could no longer care for himself. Antonio was Filipino, born in the Philippines. He had never been in a gang.

---

[4] Aradoz's friend, Amanda Heflin, who Aradoz knew as Amanda Herrera, could not be located by police.

## DISCUSSION

### I. GONZALEZ'S CONTENTIONS

#### *Senate Bill No. 1437 and Senate Bill No. 775*

Gonzalez contends that his second degree murder conviction should be reversed because Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended sections 188 and 189 to eliminate the natural and probable consequences doctrine for second degree murder, under which he contends he was convicted.

As summarized by the California Supreme Court in *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*): "Senate Bill [No.] 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*Gentile, supra*, 10 Cal.5th at p. 842.)

"[T]o amend the natural and probable consequences doctrine, Senate Bill [No.] 1437 added section 188, subdivision (a)(3) . . . : 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.'

". . . Senate Bill [No.] 1437 added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile, supra*, 10 Cal.5th at pp. 842-843.)

The court concluded that "section 188[, subd. ](a)(3) bars conviction for second degree murder under a natural and probable consequences theory." (*Gentile, supra*, 10 Cal.5th at p. 851.)

Senate Bill No. 1437 did not become effective until after Gonzalez was convicted.

9

In such a case, the *Gentile* court held that "[t]he ameliorative provisions of Senate Bill [No.] 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill [No.] 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Gentile, supra*, 10 Cal.5th at pp. 851-852.)

We granted Gonzalez's request for supplemental briefing for the parties to address the effect of Senate Bill No. 775 (Stats. 2021, ch. 551, § 2, effective Jan. 1, 2022), which was enacted in part to overrule *Gentile*. As stated in an Assembly Report: "In *Gentile*, the California Supreme Court found that the petition process set forth in Penal Code section 1170.95 is the exclusive remedy for retroactive [Senate Bill No.] 1437 relief on nonfinal judgments. (*People v. Gentile, supra*, 10 Cal.5th at pp. 851-859.) Generally, the rule is that a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. (*People v. Vieira* (2005) 35 Cal.4th 264, 306, quoting *People v. Nasalga* (1996) 12 Cal.4th 784, 789, fn. 5.) [¶] This bill would provide that where a conviction is not final, it may be challenged on [Senate Bill No.] 1437 grounds on direct appeal from that conviction." (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 775 (Reg. Sess. 2021-2022) July 13, 2021, p. 11.)

Senate Bill No. 775 adds subdivision (g) to section 1170.95: "(g) A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)."

Here, the trial court instructed the jury with CALCRIM No. 403 that Gonzalez could be convicted of second degree murder under a theory of natural and probable consequences, if the jury decided he was guilty of assault by means of force likely to produce great bodily injury. In rebuttal closing argument, the prosecutor stated there were three ways the jury could convict Gonzalez of second degree murder. The first was by finding that Gonzalez committed intentional murder that was not premeditated and

10

deliberate, as required to convict for first degree murder.

The prosecutor then told the jury:  "The other way you can get to second-degree murder on Mr. Gonzalez -- and there's actually two other ways, but I'm just going to talk about one for purposes of this rebuttal -- and that's the theory of natural and probable consequence [*sic*].  And the way the law finds it is this:  If you find that Mr. Gonzalez and Mr. Velazquez were out that night engaging in what's called an assault by means of force likely to produce great bodily injury, they were engaged in conduct that was likely to produce an assaultive great bodily injury on somebody.  And as a result of that assault by means of force likely to produce great bodily injury, Alexis Velazquez actually killed somebody, in this case Mr. Antonio.  Mr. Gonzalez is guilty of second-degree murder if you believe that that murder that Mr. Velazquez committed was a natural and probable consequence of the assault by means of force likely to produce great bodily injury."[5]

The jury found Gonzalez not guilty of first degree murder and guilty of second degree murder.

In *People v. Sanchez* (2022) 75 Cal.App.5th 191, the appellate court addressed the effect of Senate Bill No. 775 on an attempted murder conviction where the trial court instructed the jury on a valid theory (aiding and abetting) and an invalid theory (natural and probable consequences).  The *Sanchez* court held that, where the jury is instructed on both legally valid and invalid theories, the murder conviction must be reversed unless the court can determine beyond a reasonable doubt that the jury based its verdict on a legally valid theory.  The appellate court "presume[s] the legally invalid theory infected the verdict because jurors are not ' " 'equipped to determine whether a particular theory of conviction submitted to them is contrary to law . . . .' " ' [Citation.]  We 'must reverse

---

[5]  The other way Gonzalez could be convicted of second degree murder was direct aider and abettor liability.  The jury was instructed with CALCRIM Nos. 400 and 401 regarding aider and abettor liability.

11

the conviction[s] unless, after examining the entire cause, including the evidence, and considering all relevant circumstances,' we determine the error is 'harmless beyond a reasonable doubt.' [Citations.]" (*Sanchez*, at pp. 196-197; see *In re Martinez* (2017) 3 Cal.5th 1216, 1224; *People v. Aledamat* (2019) 8 Cal.5th 1, 13.)

The Attorney General argues that "the record demonstrates that the retroactive instructional error was harmless beyond a reasonable doubt," because "there was overwhelming evidence that Gonzalez participated directly in the murder," citing evidence that:  Gonzalez joined a fellow gang member, Velazquez, in hood checking the Casa del Sol mobile home park, Velazquez armed himself with a knife after a resident pulled a knife, Gonzalez and Velazquez chased down Antonio, Gonzalez held Antonio whose pleas for mercy Gonzalez and Velazquez ignored while Velazquez stabbed him, Velazquez stood over Antonio as they dropped him to the ground, Gonzalez was seen with a knife afterwards, Velazquez and Gonzalez fled and hid in a trailer, and Antonio died from stab wounds.

However, while we do not disagree with the concurrence's thorough analysis of the evidence and conclusion that it was insufficient to show the error was harmless beyond a reasonable doubt, here the prosecutor relied heavily in rebuttal argument on the natural and probable consequences doctrine rendered invalid by Senate Bill No. 1437 and Senate Bill No. 775, and did not discuss direct aider and abettor liability.  (See *In re Martinez* (2017) 3 Cal.5th 1216, 1226-1227 [evidence does not compel conclusion that jury relied on direct aider and abettor theory where prosecutor argued natural and probable consequences doctrine at length in closing argument and rebuttal].)  The Attorney General suggests rebuttal argument is less influential.  We disagree.  The prosecutor's rebuttal argument constitutes "an especially critical period of trial" coming immediately before the jury begins to deliberate.  (*People v. Pitts* (1990) 223 Cal.App.3d 606, 694; see also *U.S. v. Ayala-Garcia* (1st Cir. 2009) 574 F.3d 5, 20 ["the rebuttal context increased the likelihood of prejudice because the improper remarks were among

12

'the last words spoken to the jury by the trial attorneys' "].)  The last thing the jury heard was the prosecutor's urging the natural and probable consequences doctrine as a basis on which to convict Gonzalez of murder if jurors harbored doubts that the evidence showed he was a directly involved in Antonio's death.

Moreover, the court also instructed the jury that "the prosecution has alleged multiple theories of liability for second degree murder" against Gonzalez.  The court advised the jury:  "If the jury does not unanimously agree that Justin Gonzalez committed first degree murder, it may still find him guilty of second degree murder if all 12 jurors unanimously agree that second degree murder was committed under one of three theories: (1) he directly committed the murder as defined in other instructions, (2) he aided and abetted a murder, as defined in other instructions, or (3) he aided and abetted Alexis Velazquez in the target offense of assault by mean of force likely to produce great bodily injury, as that crime is defined in other instructions, and the murder was the natural and probable consequence of that target offense, as that theory of liability is explained in other instructions.  [¶]  In order to return a guilty verdict against Justin Gonzalez for second degree murder, the jury must be unanimous in its findings of guilt, but all 12 jurors do not need to agree on the theory of liability that establishes his guilt of second degree murder.  [¶]  Further, the individual jurors do not need to decide amongst the three theories for second degree murder so long as each juror is convinced that at least one theory applies."

Thus, the jury instructions do not establish that jurors did not convict Gonzalez under the theory of natural and probable consequences.  To the contrary, the instructions informed the jury that it could convict Gonzalez of second degree murder if one juror embraced the natural and probable consequences theory, while the other 11 were convinced he was guilty under the other two theories.

Lastly, the Attorney General maintains the jury verdict finding Gonzalez guilty of criminal street gang activity (§ 186.22, subd. (a)) "demonstrates harmlessness."  The

13

Attorney General argues the jury was instructed this "offense required Gonzalez to have willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either directly and actively committing a felony offense or aiding and abetting a felony offense." Since the only felony charged against Velazquez or Gonzalez was murder, the Attorney General implies that the jury must have found Gonzalez guilty of committing murder or of direct aiding and abetting murder, rather than under the natural and probable consequences doctrine.

However, Gonzalez's conviction under section 186.22, subdivision (a), may be based on the jury's determination that Gonzalez aided and abetted murder under the natural and probable consequences doctrine. As discussed, the jury was instructed that Gonzalez could be found guilty of second degree murder if "he aided and abetted" Velazquez in committing "the target assault by means of force likely to produce great bodily injury" and "the murder was the natural and probable consequence of that target offense . . . ." The language of this instruction reflects the principle that "the natural and probable consequences doctrine constitutes a type of aiding and abetting." (*People v. Lisea* (2013) 213 Cal.App.4th 408, 414, citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) Accordingly, a guilty verdict on section 186.22, subdivision (a), does not rule out that, as instructed, at least one juror found Gonzalez guilty of murder under the natural and probable consequences doctrine.[6]

We conclude the error in instructing the jury on the natural and probable consequences doctrine is not harmless beyond a reasonable doubt and the verdict against

---

[6] We agree with the Attorney General that where, as here, the defendant secures a reversal on appeal of his or her conviction due to trial error other than insufficiency of the evidence, the defendant is subject to retrial. (*People v. Hernandez* (2003) 30 Cal.4th 1, 6; see also *In re D.N.* (2018) 19 Cal.App.5th 898, 902 ["Double jeopardy forbids retrial after a reversal due to insufficient evidence to support the verdict. [But] [w]here the prosecution makes its case under the law as it stood at trial, double jeopardy is not implicated as it would otherwise be where there is evidentiary insufficiency"].)

14

Gonzalez must be reversed.

## II. VELAZQUEZ'S CONTENTION

Velazquez contends the trial court erred in responding to a jury question regarding the meaning of the phrase "knowing the consequences" in CALCRIM No. 521, the pattern instruction on first degree murder. Velazquez argues that the court's use of language taken from *Cordero, supra*, 216 Cal.App.3d 275 to formulate a response to the jury's question "diminished the requirement that the prosecution prove that [Velazquez] carefully considered whether or not to kill and the consequences of his action." We disagree.

CALCRIM No. 521, as given by the trial court, instructed the jury in relevant part: "A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death."

On the third day of deliberations, the jury sent a note that quoted the sentence of CALCRIM No. 521 containing the phrase "knowing the consequences" and asked: "In the highlighted section, is it consequences for the *defendant* or for the *victim*?"

The next day the trial court addressed the jury's question. The prosecutor was present and Velazquez's counsel was on the telephone. The court held an off-the-record discussion with counsel, which the court summarized on the record, as follows: The night before the court had received a proposed answer from the prosecutor based on *Cordero*. "The jury in that case asked a question of the Court that is almost exactly the same as the juror question here . . . and *Cordero* found that the Court should have answered it in a substantive way rather than just referring the jurors back to the

15

instructions." The trial court noted that prosecution's draft instruction was drawn "almost verbatim from the language in *Cordero*."

The court read the draft response: "The consequences contemplated in instruction 521 are those flowing from the act of killing. In this context, the law does not require that a Defendant's reflection specifically concern the consequences to the killer, the victim, or any other particular thing. The killer need only reflect on some consequence of the act about to be committed."

The court stated that Gonzalez's counsel agreed with the draft response but counsel for Velazquez did not. However, Velazquez's counsel "did waive his right to come in and argue it at this time, and instead he's going to put his comments on the record at the next appearance." The court then stated its intention to give the jury the response drafted by the prosecution and handed it to the bailiff. Less than two hours later, the jury reached a verdict.

Counsel for Velazquez thereafter put his objection on the record. "As I indicated, I guess off the record technically, that we would object to any further instruction of the jury. We would submit -- we would say it was an impermissible pinpoint instruction violative of my client's due process rights under the Fourteenth Amendment of the U.S. Constitution." The court responded: "Thank you. That objection is noted."

The People contend that "Velazquez's failure to contemporaneously and specifically object to the court's response forfeited this claim on appeal." However, the cases the People cite found forfeiture where a defendant *consented* to the court's proposed answer to a jury question. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived"], disapproved on another ground in *People v. Leon* (2020) 8 Cal.5th 831, 848; *People v. Dykes* (2009) 46 Cal.4th 731, 798 [rejecting claim of error in court's response to jury question in part because "the answer to the jury's question was approved by defense counsel"].)

16

Here, Velazquez's counsel made an objection to the court's proposed answer in a discussion off the record but reserved his statement of grounds until his next appearance in court. While in hindsight one may question the wisdom of this two-part approach, it does not amount to forfeiture of the issue on appeal by failure to object. Moreover, we conclude that the court's definition of "consequences," like any other instruction given to the jury, may be reviewed even in the absence of an objection for the purpose of determining if "the substantial rights of the defendant were affected thereby." (§ 1259.)

Even so, Velazquez's claim fails on the merits. Velazquez agrees that the trial court did not abuse its discretion by answering the jury's question that "consequences" meant consequences to the defendant or the victim. He argues that the court erred when it "expounded unnecessarily on the meaning of consequences and adopted language in *Cordero*." According to Velazquez, this language was misleading and incorrect because it included that the requisite reflection on the consequences of a killing could concern "any other particular thing" and need only involve "some consequence." Velazquez's position is that the court's response wrongly informed the jury that considering an "insignificant," "trivial," or "negligible" consequence would be sufficient reflection to constitute "deliberation." Such consequences, Velazquez maintains, do not "rise to the level of the careful reflection for and against the defendant's course of action" but "will require little reflection and not the careful weighing for and against killing that is required to constitute 'deliberation.' "

Velazquez misses the point of the language from *Cordero* adopted by the trial court. This language properly encompasses other consequences besides those pertaining to the defendant or the victim. As the appellate court explained: "Homicides occur in diverse factual settings and the thought processes invoked by assailants are varied; in many instances an assailant will contemplate consequences to *both* the victim and to his or her own future. In other cases, the deliberation will simply invoke consequences to a

17

third party or even an idea or strongly held principle (e.g., politically or religiously motivated assassinations)." (*Cordero, supra*, 216 Cal.App.3d at p. 281.)

To impose a requirement that the "consequence" must rise to certain level puts the subject matter of the consequence over the reflection on killing that distinguishes first degree murder. In the passage containing the language that Velazquez now challenges, the court in *Cordero* further explained, "The 'consequences' contemplated in [the pattern jury instruction] are those flowing from the act of killing—it is this act which must be premised upon 'reflection.' It is this preexisting reflection that elevates murder to its highest degree. Nowhere does the law require this reflection specifically to concern the consequences to the killer, the victim, or any other particular thing. The killer need only reflect on *some* consequence of the act about to be committed." (*Cordero, supra*, 216 Cal.App.3d at p. 282.)

Thus, it would have been insufficient for the trial court to answer the jury's specific question simply that consequences could be to the defendant or the victim. The requisite reflection could involve a consequence to something besides the defendant or the victim.

We find Velazquez's concern that the jury may consider reflection on some minimal consequence sufficient for deliberation to be overblown. As the court told the jury, reflection must concern consequences "flowing from the act of killing." Killing is an act incompatible with reflection on inconsequential matters.

Moreover, the consequences the jury may consider flowing from the killing are all those "established by the evidence." (*Cordero, supra*, 216 Cal.App.3d at p. 283.) The evidence here included Velazquez's boast from jail to a gang associate that Gonzalez had validated him in VBN because of Antonio's murder. This is evidence that the consequences Velazquez contemplated flowing from the killing were the benefit to Varrio Bosque Norteño and his status in the gang. Such consequences are not insignificant, trivial or negligible.

18

Given that the jury was confused as to whether the phrase "knowing the consequences" in CALCRIM No. 521 referred to consequences to the defendant or victim, it was appropriate for the trial court to inform the jury that the phrase referred to consequences to the defendant, victim or some other consequence "flowing from the act of killing."

The judgment against Velazquez is affirmed.

## DISPOSITION

Gonzalez's murder conviction is reversed and the finding as to the associated enhancement is vacated. We remand the matter to the trial court with instructions that the People may, if they choose, retry Gonzalez on count 1 within the time limit prescribed by law. If the People choose not to retry, the trial court is directed to resentence Gonzalez on count 2. The judgment against Velazquez is affirmed.

           /s/           
RAYE, P. J.

I concur:

      /s/           
KRAUSE, J.

19

MURRAY, J., Concurring—

I concur with the majority's reversal of Gonzalez's murder conviction but I disagree with the majority that the prosecution's rebuttal argument is dispositive here on the question of harmless error under *Chapman v. California* (1967) 386 U.S. 18.

My focus is on the evidence the Attorney General argues establishes direct aiding and abetting liability. I agree with the Attorney General that harmless error can be established when overwhelming evidence supports a valid theory. Indeed, our high court has made clear, when it comes to alternative-theory error, there is no hybrid standard for determining harmlessness. (*People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*).) Rather, "*the usual* 'beyond a reasonable doubt,' " *Chapman* standard applies. (*Aledamat*, at p. 3, italics added.) Under that standard, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, *including the evidence*, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Ibid.*, italics added.)

The *Aledamat* court cited several federal circuit court opinions applying the *Chapman* test to alternative-theory error, three of which are pertinent here. (*Aledamat, supra*, 8 Cal.5th at p. 11.) In one, the circuit court, after examining the record, determined the alternative-theory error there was harmless beyond a reasonable doubt because the evidence underlying a valid theory was "overwhelming." (*United States v. Skilling* (5th Cir. 2011) 638 F.3d 480, 483 (*Skilling II*) [concluding that alternative-theory error related to the invalidated honest services theory of the charged conspiracy was harmless beyond a reasonable doubt because evidence of the valid securities fraud theory of the conspiracy was "overwhelming"].)

In two others, the circuit court employed a similar method for determining harmlessness for alternative-theory error under the beyond a reasonable doubt test: "[I]f the evidence that the jury necessarily credited in order to convict the defendant under the instructions given . . . is such that the jury must have convicted the defendant on the

1

legally adequate ground *in addition to or instead of the legally inadequate ground*, the conviction may be affirmed." (*Bereano v. United States* (4th Cir. 2013) 706 F.3d 568, 578, italics added (*Bereano*) [addressing alternative-theory error related to the invalidated honest services theory of mail fraud]; *United States v. Jefferson* (4th Cir. 2012) 674 F.3d 332, 361 (*Jefferson*) [same—wire fraud].)

Based on *Aledamat*, and the cases cited with apparent approval therein, I believe an analysis looking solely to the prosecution's closing argument places too narrow a focus on the question of harmless error. In my view, "if the evidence that the jury necessarily credited in order to convict the defendant under the instructions given" overwhelmingly establishes a valid theory and that evidence "is such that the jury must have convicted the defendant on the legally adequate ground *in addition to or instead of the legally inadequate ground*, the conviction may be affirmed." (See *Skilling II, supra*, 638 F.3d at p. 483; *Bereano, supra*, 706 F.3d at p. 578, italics added; *Jefferson, supra*, 674 F.3d at p. 361.) As I shall discuss, the problem for the Attorney General here is that the evidence does not overwhelmingly establish Gonzalez's guilt as to second degree murder based on a direct aiding and abetting theory.

The majority appears to rely on *People v. Sanchez* (2022) 75 Cal.App.5th 191 (*Sanchez*), which found an alternative-theory error was not harmless because it could not "conclude the jury did not rely on this now-invalid theory." (*Sanchez*, at pp. 193-194 [addressing alternative-theory error related to the elimination of the natural and probable consequences theory for attempted murder in Senate Bill No. 775].) The record, according to the *Sanchez* court, "d[id] not provide any insight into the jury's deliberations and the theory underlying the verdict is impossible to divine." (*Sanchez*, at p. 198.) But, given that the "usual" harmless error standard applies, other means of determining harmlessness under *Chapman* can be employed.

While citing *Aledamat*, the *Sanchez* court relied on our high court's earlier opinions in *People v. Chiu* (2014) 59 Cal.4th 155 and *In re Martinez* (2017) 3 Cal.5th

2

1216. (*Sanchez, supra*, 75 Cal.App.5th at pp. 196-197.) In *Martinez*, the court stated that alternative-theory error, "requires reversal unless the reviewing court concludes beyond a reasonable doubt that the jury actually relied on a legally valid theory in convicting the defendant of first degree murder." (*Martinez, supra*, 3 Cal.5th at p. 1218 [discussing *Chiu* error].) But the *Aledamat* court clarified that the *Chiu/Martinez* means of determining harmlessness was not exclusive and, "*Chiu* and *Martinez* were only a specific application of the more general reasonable doubt test." (*Aledamat, supra*, 8 Cal.5th at p. 12.)

The *Aledamat* court went on to state: "the reviewing court is not limited to a review of the verdict itself. An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary. In both *Chiu* and *Martinez*, we examined the record and found that it affirmatively showed the jury might have based its verdict on the invalid theory. *Because no other basis to find the error harmless beyond a reasonable doubt was at issue, we did not explore whether other ways of finding the error harmless existed. Those cases merely provide one way in which a court might evaluate harmlessness. They do not preclude other ways*." (*Aledamat, supra*, 8 Cal.5th at p. 13, italics added.) The *Aledamat* court disapproved of any interpretation "that limits the reviewing court to an examination of the jury's findings as reflected in the verdict itself." (*Id*. at p. 12.)

Accordingly, the method the *Sanchez* court apparently thought was the exclusive way of determining harmlessness beyond a reasonable doubt, is not the only way. In my view, focusing solely on the prosecution's argument channeling the jury toward a specific verdict also ignores other means of establishing harmlessness. Harmlessness can be established when the evidence supporting a valid theory is overwhelming (*Skilling II, supra*, 638 F.3d at p. 483) and/or if the evidence is such that the jury, applying the instructions given, must have convicted on that legally adequate valid theory in addition to or instead of the legally invalid theory. (*Bereano, supra*, 706 F.3d at p. 578; *Jefferson,*

3

*supra*, 674 F.3d at p. 361.)  This test could be met in cases where the prosecutor argued both the legally valid and the subsequently invalidated theory.  Thus, the Attorney General's argument that the evidence of direct aiding and abetting liability was overwhelming cannot be rejected solely based on the prosecutor's argument.

However, while I part ways with the majority in this respect, I nevertheless concur with the result as to Gonzalez's murder conviction, because the evidence of direct aiding and abetting here is not overwhelming for purposes of *Chapman* harmless error analysis.

In this regard, the Attorney General relies on the testimony of Raquel P. describing Gonzalez's conduct during the stabbing.  She testified that Velasquez and Gonzalez chased down Antonio and upon catching him, Gonzalez grabbed him in a bear hug and Velasquez stabbed him.  If the stabbing actually took place as Raquel P. described, the evidence of Gonzalez's culpability as a direct aider and abettor could be considered overwhelming for purposes of *Chapman*.  But Raquel P.'s testimony was not flawless.

As the majority notes, Raquel P. could not identify Gonzalez either at the scene or in a photographic lineup.[7] (Maj. opn. *ante*, at p. 6.)  Yet she later identified Gonzalez at trial.[8]  And, as Gonzalez points out, Raquel P.'s trial testimony may have been tainted by

---

[7]  Raquel P. failed to identify Gonzales in these pretrial identification procedures even though she testified the assailants were her neighbors, and she had seen them both before. She also insisted at trial that she had identified Gonzalez at the scene, and if the officer who was there with her said she did not identify him, the officer is "wrong."

[8]  I note that the in-court identification came in the second day of Raquel P.'s testimony. At the end of her first day of testimony, the prosecutor's last question was whether she saw the person who stabbed Antonio in the courtroom, and she identified Velazquez. Then, without asking her whether she saw the person who held Antonio in the courtroom, the prosecutor told the court it was a good time to break for the evening recess.  The following morning, during the prosecutor's direct examination, he asked Raquel P. if she saw the person who held Antonio in the courtroom, she said she did and identified Gonzalez.

4

her desire to obtain victim compensation and a U visa to remain in the United States.[9] She had been told she was ineligible for the U visa because she was not listed as a victim in the police reports. She, thereafter, visited the police department with an immigration attorney to discuss the U visa with one of the investigators on the case. When that investigator asked her why she thought she was a victim, she said Velasquez "tried to point" a knife at her as he left the scene—a fact she never mentioned during her original police interviews. She also claimed that a person had been lurking around her trailer after the murder—another claim she never raised before the U visa came up.

Additionally, that same investigator watched the trailer park surveillance video recordings for the night of the murder "no less than 15 times," and never saw Raquel P. in any of the recordings. Nor did others on the scene see Raquel P. near Antonio or in the vicinity of the stabbing, as she described in her testimony.

Further, as Gonzalez points out, Raquel P. had a prior conviction for welfare fraud and had previously been on diversion for animal neglect.

---

[9] The United States Citizenship and Immigration Services website describes U visas: "The U nonimmigrant status (U visa) is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity. Congress created the U nonimmigrant visa with the passage of the Victims of Trafficking and Violence Protection Act (including the Battered Immigrant Women's Protection Act) in October 2000. The legislation was intended to strengthen the ability of law enforcement agencies to investigate and prosecute cases of domestic violence, sexual assault, trafficking of noncitizens and other crimes, while also protecting victims of crimes who have suffered substantial mental or physical abuse due to the crime and are willing to help law enforcement authorities in the investigation or prosecution of the criminal activity. The legislation also helps law enforcement agencies to better serve victims of crimes." Under the website tab for eligibility, several criterion are listed, including: "You are the victim of qualifying criminal activity" and "You have suffered substantial physical or mental abuse as a result of having been a victim of criminal activity." (<https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status> [as of Mar. 21, 2022].)

In addition, Raquel P.'s testimony conflicted with another witness, Cristian H. Cristian H. saw a man chasing Antonio. During the chase, he thrust his body into Antonio in a way he described as football tackling. Both fell to the ground. They both then got up, and Antonio put his hands out, palms in front of him.[10] Cristian H. then saw the other man pull something from his waist and appear to stab Antonio. Cristian H. never testified that someone was holding Antonio when he was stabbed. He testified that only one person had chased Antonio and there was no third person around.

The codefendant, Aradoz, similarly did not testify to seeing Gonzalez holding Antonio. She remembered a physical altercation that seemed like a fistfight. And she testified that Antonio was on the ground, and Velasquez and Gonzalez were on top of him on their knees. Aradoz then saw Velazquez standing over Antonio with a big kitchen knife, before she walked away with her friend. (Maj. opn. *ante*, at p. 8.)

In my view, this evidence establishes that Gonzalez was involved. But contrary to the Attorney General's argument, it is not overwhelming as to direct aiding and abetting liability. Aiding and abetting complicity based on the natural and probable consequences doctrine (with the target crime being assault) was established based on the testimony of Rachel P., Cristian H. and Aradoz. However, the evidence that Gonzalez, in fact, chased Antonio down with Velasquez *and thereafter held Antonio while Velasquez stabbed him*, and in doing so, had the intent to aid Velasquez in killing Antonio or the intent to aid Velasquez in committing a life endangering act, is not overwhelming.[11] Consequently,

_____

[10] For her part, Raquel P. testified that Antonio never put his hands out in front of him before being stabbed "because he was being held down by the one who was behind him."

[11] I, of course, acknowledge that I do not have the benefit of watching Raquel P. testify, and her presentation and demeanor in front of the jury may have been compelling. But we must assess harmlessness based on the record before us, and to the extent the Attorney General argues the evidence of direct aiding and abetting was overwhelming based on that record, I cannot agree.

6

even under the theory of harmlessness in *Skilling II, supra*, 638 F.3d 480, or the theory in *Bereano, supra*, 706 F.3d 568 and *Jefferson, supra*, 674 F.3d 332, I cannot conclude the retroactive alternative-theory error here was harmless beyond a reasonable doubt.

Accordingly, I concur with the majority that Gonzalez's second degree murder conviction must be reversed and this matter must be remanded for a new trial on valid theories of second degree murder.

I concur in the majority opinion in all other respects.


     /s/
MURRAY, J.*

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.